PUBLISH

FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

September 11, 2012

Elisabeth A. Shumaker
Clerk of Court

COMMUNICATION WORKERS OF
AMERICA,

Plaintiff – Appellee,

v.

AVAYA, INC.,

Defendant - Appellant.

No. 11-1470

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:10-CV-02464-LTB-BNB)**

Patrick R. Scully (Sarah R. Peace with him on the brief) of Sherman & Howard L.L.C.,
Denver, Colorado, for Defendant-Appellant.

Stanley M. Gosch of Rosenblatt & Gosch, P.L.L.C., Greenwood Village, Colorado, for
Plaintiff-Appellee.

Before **KELLY,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and **O'BRIEN**, Circuit
Judge.

**O'BRIEN**, Circuit Judge.

## I. Introduction

Avaya Inc. ("Avaya") appeals from the district court's ruling compelling

arbitration of its labor dispute with the Communication Workers of America ("CWA")

over the legal status of a class of Avaya employees called "backbone engineers." The union views the backbone engineers as non-represented "occupational" employees and legitimate objects for its organizing campaigns, while Avaya sees them as managers outside the scope of the company's labor agreements. CWA contends the parties' collective bargaining agreement ("CBA") requires any dispute over the status of backbone engineers to be resolved in arbitration. Avaya maintains the parties did not consent to arbitrate the status of its backbone engineers and accuses CWA of trying to unilaterally enlarge the CBA to encompass disputes over company management. Having reviewed the CBA and the evidence submitted to the district court, we agree with Avaya's position and reverse the district court's order compelling arbitration.

## II. Background

A. The Collective Bargaining Agreement

The CBA between Avaya and CWA governs the employment conditions of Avaya employees who have elected to be represented by the CWA in labor disputes with company management. This group, known as the "bargaining unit," consists of occupational employees whose titles are listed in the CBA; it does not include management or non-represented employees, nor does it list backbone engineers among the represented members. Most important for this appeal are Articles 9 and 10, which lay out the grievance-and-arbitration process governing labor disputes arising during the term of the CBA. The procedures described in these articles make up the exclusive process for resolving "employee disputes" under the CBA. (App. App'x 32.) "If, at any time, a

difference arises between the Company and the Union regarding the true intent and meaning of a provision under [this Agreement], or a question as to the performance of any obligation hereunder," the grievance procedures shall be used to settle the differences. (App. App'x 35.) A grievance is "a complaint involving the interpretation or application of any of the provisions of [the CBA], or a complaint that an employee(s) has in any manner been unfairly treated." (App. App'x 32.)

The grievance procedure consists of three steps. Each step requires written notice of the grievance (or, in the later steps, of the grievance appeal) and a meeting to discuss the grievance involving officials from both the union and the company. The participating officials become progressively more senior as the process evolves, and by step three the discussions involve the union's vice president and the company's vice president of labor relations. Only when these steps have been exhausted and no resolution reached can the parties resort to arbitration, "it being understood that the right to require arbitration extends only to matters expressly set forth in this Article and which are not otherwise expressly excluded from arbitration." (App. App'x 35.)

B. The Neutrality Agreement

Appended to the CBA is a National Memorandum of Understanding ("National Memorandum") reflecting a trilateral agreement between Avaya, CWA, and the International Brotherhood of Electrical Workers (IBEW) and setting forth the parties' understandings on issues like wages, hours, pensions, and other terms and conditions of employment. Over Avaya's objection, the district court accepted CWA's invitation to

- 3 -

treat the National Memorandum as a continuation of the CBA.  By its terms, the court observed, the National Memorandum "binds the CWA and its local labor unions, the IBEW and its affiliated local unions, and Avaya to amend and extend" their collective bargaining agreements "so as to incorporate the items hereinafter set forth. . . ."  (App. App'x 170.)  The National Memorandum "shall become effective as to the CWA . . . only if ratified by the CWA membership [before July 29, 2009]," and the "amended collective bargaining agreements between the parties" shall terminate in June 2012. (App. App'x 170.)  The record does not reflect whether CWA ratified the National Memorandum before July 29, 2009, but since both parties recognize the National Memorandum as a live agreement governing consent elections for unrepresented employees, we assume it was timely ratified.

Under a subsection relating to union-management relations, the National Memorandum includes a Neutrality Agreement governing union organizing efforts directed at unrepresented "non-management" employees.  (App. App'x 246.)  In recognition of the union's goal of growing its membership, the agreement sets forth the "exclusive means" by which the union will conduct efforts to organize unrepresented non-management employees.  (App. App'x 246.)  The organizing and election procedures are meant to foster a "neutral" organizing environment in which the union is afforded a reasonable opportunity to communicate with non-management employees.  (App. App'x 246-48.)

- 4 -

Alleged violations of the neutrality provisions are to be "handled via the dispute resolution process contained in this Agreement." (App. App'x 250.) Under that process, disputes arising during the course of an organizing effort will be addressed in the first place by the parties themselves, preferably at the local level, and in the event good faith efforts to resolve the matter fail, by a "third party neutral" (TPN) agreed upon by the parties. Compared to the three-step process prescribed in the CBA, dispute resolution under the Neutrality Agreement is fluid and informal, the only precondition to arbitration being a good faith attempt by the parties to resolve the matter. (App. App'x 250.)

C. CWA's Organizing Drive

In March 2010, CWA commenced an organizing drive directed at Avaya backbone engineers located in Denver, Colorado. Backbone engineers provide engineering support for the company's hardware and software products. They are classified as management in the corporate title guide and benefits program, and many of them dispatch and oversee the work of teams of technicians.

In the chain of correspondence following the organizing drive, the parties laid out their positions on the status of the backbone engineers, the propriety of the organizing drive, and the appropriate course for resolving what looked by then to be an unavoidable conflict. Avaya insisted the Neutrality Agreement does not apply to the union's organizing campaign, because backbone engineers are management employees outside the scope of the Neutrality Agreement. In Avaya's view, the only method of organizing the backbone engineers is through the procedures set forth by the National Labor

Relations Board (NLRB). By contrast, CWA maintained that backbone engineers are non-represented occupational employees who are eligible to be organized under the consent-election procedures in the Neutrality Agreement.

CWA proposed appointing a TPN to determine whether backbone engineers qualify as non-management within the meaning of the Neutrality Agreement. Maintaining the dispute falls outside the scope of the Neutrality Agreement (and therefore outside the scope of the Neutrality Agreement's dispute-resolution process), Avaya refused.

With no hope of a private settlement, CWA filed a formal grievance under the CBA accusing Avaya of improperly denying access to backbone engineers and then failing to follow the dispute-resolution procedures in the Neutrality Agreement. The remedy sought: order Avaya to choose a TPN to resolve the dispute over the status of the backbone engineers. Avaya rejected the grievance, and CWA appealed to step three of the CBA's dispute-resolution process, at which point the parties held a settlement meeting but ultimately failed to resolve their dispute.

Having exhausted the grievance procedure, CWA notified Avaya that it would be submitting the grievance to arbitration. Avaya refused arbitration and, in a June 8 letter, explained it's position: the dispute was not arbitrable because the CBA does not apply to backbone engineers.

D.  CWA's Suit to Compel Arbitration

On October 8, 2010, four months after Avaya's June 8 refusal to arbitrate, CWA filed a complaint to compel arbitration in the District of Colorado.  Contending the parties never agreed to arbitrate disputes over management employees, Avaya moved for summary judgment.  It cited materials showing backbone engineers were classified as managers and provided benefits commensurate with those received by management.  It also cited documents showing the parties' understanding that "management" does refer not to "manager" as that term is defined by the federal labor laws, but rather to the class of Avaya employees who perform non-occupational duties.  CWA submitted only one bit of evidence refuting Avaya's designation of backbone engineers as management—an affidavit from a CWA official expressing his "belief" that backbone engineers are occupation employees eligible for union representation.

Following cross motions for summary judgment, the district court denied Avaya's motion and granted CWA's. The court concluded the catch-all arbitration clause in the CBA covers the dispute over whether the backbone engineers' status is arbitrable under the Neutrality Agreement.  The court addressed Avaya's contention about backbone engineers being managers outside the scope of the arbitration agreements, by saying "such [a] determination is an assessment of the underlying merits before an arbitrator and, as such, is not before me."[1]

---

[1] The district court rejected Avaya's additional arguments.  First, it rejected

- 7 -

## III. Discussion

Avaya challenges the order compelling arbitration on three grounds. It argues the parties' dispute is not subject to the CBA's arbitration clause,[2] because Backbone engineers are neither members of the bargaining unit nor eligible to become members in the future. They are *management*, Avaya insists, a class of workers whose terms of employment are outside the CBA and of no concern to the union. The district court did not challenge this assertion in concluding the dispute was arbitrable. Rather, it determined the question of arbitrability—whether the parties agreed to arbitrate the status of the backbone engineers under the Neutrality Agreement—was itself an arbitrable issue under the CBA. Avaya contends that this, too, was error: the scope of an arbitration clause is a matter for judicial resolution, and Avaya maintains the district court was required to examine the Neutrality Agreement at the outset to determine whether it

---

Avaya's argument that the complaint to compel arbitration was untimely because it was filed more than six months after Avaya first refused arbitration. The court concluded that the complaint had been filed within six months of Avaya's refusal to arbitrate, which, contrary to Avaya's assertions, came on June 8, shortly after CWA announced it would be submitting the grievance to arbitration under the CBA. Second, the court rejected Avaya's contention that the case belongs before the National Labor Relations Board rather than a federal court; it explained that questions of contract interpretation, and particularly questions about the scope of an arbitration clause, are squarely within the jurisdiction of the federal courts.

[2] Avaya also argues (1) the complaint was untimely and should not have been considered, and (2) the district court lacked jurisdiction because CWA sought to arbitrate issues within the primary jurisdiction of the National Labor Relations Board. Because we agree with Avaya that the dispute is not arbitrable and that reversal is proper on that basis alone, we do not address these alternative arguments.

covered the dispute over backbone engineers.  Had it done so, Avaya continues, the court would have been compelled to conclude the arbitration clause does not extend to disputes over employees, like backbone engineers, whom Avaya classifies as managers.

We review a grant of summary judgment without deference, applying the same legal standard as the district court.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).  Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Because arbitration is a creature of contract, a party cannot be forced to arbitrate any issue he has not agreed to submit to arbitration.  *AT & T Tech., Inc. v. Commc'n Workers*, 475 U.S. 643, 648 (1986); *Local 5-857 Paper, Allied-Industrial, Chemical and Energy Workers Int'l Union v. Conoco, Inc.*, 320 F.3d 1123, 1126 (10th Cir. 2003).  The Supreme Court has recognized a presumption in favor of arbitration in the labor relations context.  *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  Accordingly, where a dispute arises under a collective bargaining agreement, it must be arbitrated unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Id*.  Where, as here, the parties have agreed upon an inclusive arbitration clause covering any dispute arising out of the CBA, the court's role is limited to determining whether a party is "making a claim which on its face is governed by the contract."  *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 567-68 (1960).

- 9 -

This case requires reconciling two competing principles governing judicial review in this area. First, courts (rather than arbitrators) must evaluate the threshold question of whether the parties consented to submit a particular dispute to arbitration. *See AT & T Tech.,* 475 U.S. at 649. Second, courts making this determination are not to rule on the potential merits of the underlying claims. *Id.* These rules clash in cases where the merits of the claim are bound up with the question of arbitrability. *See, e.g.*, *Int'l Bhd. of Elec. Workers, Local 1 v. GKN Aerospace N. Am., Inc.*, 431 F.3d 624, 627 (8th Cir. 2005); *Rite Aid of Penn. v. United Food and Comm. Workers Union, Local 1776*, 595 F.3d 128, 141-42 (3d Cir.), *cert denied*, 131 S. Ct. 187 (2010). On those occasions, the Supreme Court tells us, the court's duty to determine whether the party intended the dispute to be arbitrable trumps its duty to avoid reaching the merits: "Although 'doubts should be resolved in favor of coverage,' we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 209 (1991) (quoting *AT&T Tech*, 475 U.S. at 560). This is a sensible compromise, not least because it avoids a situation where arbitrability hinges on what the party seeking arbitration characterizes as arbitrable.

The federal courts of appeal have been faithful to the principle expressed in *Litton*. *See, e.g.*, *United Parcel Serv., Inc. v. Union de Tronquistas, Local 901*, 426 F.3d 470, 472-74 (1st Cir. 2005); *Int'l Bhd. of Elec. Workers*, 431 F.3d at 628-29 ("[I]f a court is entirely blind to the merits of a grievance, then the parties could be forced to arbitrate

grievances that have no relationship whatsoever to the collective bargaining agreement."); *see also Rite Aid of Penn.*, 595 F.3d at 136 (3d Cir. 2010) ("[W]here the merits and arbitrability questions are inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits."); *Indep. Lift Truck Builders Union v. Hyster Co.*, 2 F.3d 233, 236 (7th Cir. 1993) ("[A] court cannot address the arbitrability question without at the same time addressing the underlying merits of the dispute."). And consistent with *Litton*, we have held that facts are more important than legal labels in determining whether a claim is arbitrable. *See Chelsea Family Pharmacy, PLLC v. Medco Health Solutions*, 567 F.3d 1191, 1197-98 (10th Cir. 2009); *see also P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) ("[I]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted.") (quotation marks omitted).

In light of these principles, the district court was wrong to compel arbitration based on nothing more than CWA's "belief" that backbone engineers were legitimate targets for an organizing drive. Concerned about intruding on the province of the arbitrator, the district court lost sight of its duty to determine whether the parties consented to arbitrate the dispute in the first place. Without a judicial determination of arbitrability, the scope of the arbitration clause became subject to the artful pleading of the union, resulting in CWA having "unilateral and unfettered discretion" to determine

when and on what basis Avaya had to participate in arbitration. *See E.M. Diagnostic Sys. v. Local 169, Int'l Bhd. of Teamsters*, 812 F.2d 91, 95 (3d Cir. 1987).

This case well illustrates the point. Had the court addressed the threshold question of consent, it would have faced compelling evidence that the parties did not agree to submit the dispute over the backbone engineers to arbitration. Two key facts strongly suggest the dispute is not governed by the parties' labor agreements. First, the parties understood the Neutrality Agreement, which by its terms applies only to "non-management employees," to govern consent elections for *occupational* workers. This much was clear from the record, which included an affidavit from Avaya's Director of Labor Relations stating that the parties understood 'management' to denote "non-occupational employees." (App. App'x 381). But it was also clear from the parties' use of the term in the CBA and National Memorandum. Although neither agreement defines "management," context suggests the term refers not to a legal definition but rather to a readily identifiable class of non-occupational Avaya employees. In other words, "management" includes those employees whom Avaya designates as managers.

If "management" meant something else, indeed if it meant anything but the opposite of "occupational employee," otherwise straightforward terms governing the day-to-day dealings between company and union would become vexing and difficult to comply with. Take the provision about union activity on company premises, which permits union representatives to "enter upon Company premises after obtaining approval from a management representative of the Company" (App. App'x 28); or the provision

requiring starting rates to be granted "based on the Company's non-management employee starting wage policy" (App. App'x 46); or the one about layoffs, which "shall be in inverse order of seniority" except for certain employees who have been "assigned to a management title" for more than a year prior to returning to the bargaining unit (App. App'x 48). These provisions presume a familiarity with Avaya management—an ability to readily distinguish it from non-management, which would be impractical if the parties had to consult a legal definition each time the meaning of "management" came into question. This would disrupt labor relations between the parties and turn day-to-day disputes—entry on company premises, the availability of certain starting rates—into highly fraught questions of legal interpretation. Given the frequency with which the undefined term appears in the labor agreements and the practical necessity of having a working definition, we think it clear from the record that "management" refers to those employees classified by Avaya as managers.

The second important fact the court would have noticed is this: backbone engineers are not among the employees classified by the company as "occupational." That Avaya held this view is plain from its corporate title guide, which classifies backbone engineers as management, as well as from its benefits program, which creates separate plans for managers and occupational employees and specifies that backbone engineers will participate in only the former. But Avaya also introduced evidence of CWA sharing the company's understanding of backbone engineers. Documents from previous grievance disputes show CWA representatives referring to backbone engineers

as management employees.  In one grievance, CWA complained about backbone engineers performing dispatching and routing work that should have been reserved for occupational workers.  In a second, the union complained about Avaya unlawfully shifting bargained-for work to management positions (like backbone engineers) in order to justify layoffs.  Implicit in these grievances is the notion that backbone engineers are managers who should not be performing work reserved for represented employees— further support for Avaya's argument about a mutual understanding—backbone engineers are managers.

The record provides forceful evidence that parties did not contractually consent to arbitrate disputes over Avaya's backbone engineers.  The Neutrality Agreement provides a process for resolving disputes arising from organizing drives directed at "non-management employees."  If, as the evidence establishes, the parties understood the term "management" to denote non-occupational employees; and if there is no real dispute about the classification of backbone engineers as non-occupational; there can be only one conclusion to draw from the record:  the parties did not consent to submit the underlying dispute to arbitration.

CWA contends the district court had no business evaluating the Neutrality Agreement because the scope of the agreement was not before the court as a part of CWA's motion to compel arbitration.  Rather, the question presented to the district court concerned the scope of the CBA and the arbitrability of the underlying arbitration dispute; that is, the court was asked to decide whether the parties agreed to arbitrate their

- 14 -

disagreement over the status of backbone engineers under the Neutrality Agreement. In CWA's view, a judicial determination that the parties did not consent to arbitrate the labor dispute under the Neutrality Agreement would be an answer to a question never asked.

The inquiry cannot be so easily compartmentalized. While it is true the question of arbitrability under the Neutrality Agreement was not directly before the court, it was a question the court was nevertheless required to answer. The presumption favoring arbitration does not apply when the dispute itself concerns arbitration. *Peabody Holding Co. v. United Mine Workers*, 665 F.3d 96, 102 (4th Cir. 2012). Such disputes are to be resolved by the courts unless the parties have agreed, in "clear and unmistakable" terms, to submit them to arbitration. *Rent-A-Center, W., Inc. v. Jackson*, 130 S.Ct. 2772, 2783 (2010).

In this case it is neither "clear" nor "unmistakable" that the parties agreed the dispute resolution procedures in the CBA would cover arbitration disputes arising under the Neutrality Agreement. It is not enough for the parties to have an arbitration clause purporting to sweep up all disputes arising from the labor agreement. *See Peabody Holding Co.*, 665 F.3d at 102 ("The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice."). Yet that is precisely the type of clause we have here: "[the arbitration provisions] provide the mutually agreed upon and exclusive forums for resolution and settlement of employee disputes during the term of this agreement." Nothing in that sentence suggests the parties

meant to reserve for the arbitrator disputes about arbitrability, much less disputes arising under an entirely independent arbitration clause in the Neutrality Agreement.

In the end, the district court had its presumptions backwards: instead of applying the presumption in favor of arbitration, it should have applied the presumption in favor of judicial resolution. The court should have begun its analysis by asking whether the parties did or said anything to rebut the presumption that questions about the arbitrability of an arbitration dispute will be resolved by the courts. Assuming the answer was no, the court should have then determined whether there was a fact issue regarding the parties' consent to submit to arbitration the dispute over the backbone engineers. Any doubts in this regard could have been resolved in favor of arbitration, *see United Steelworkers*, 363 U.S. at 582, but as we have already explained, the record leaves no room for doubt: a plain reading of the Neutrality Agreement confirms Avaya's assertion that the parties never agreed to submit the dispute to arbitration. The district court should have denied CWA's motion to compel arbitration and dismissed the case.

For the foregoing reasons, we REVERSE the district court's order compelling arbitration and REMAND for resolution consistent with this opinion.