**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 17, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION
AND ITS LOCAL 13-857,

      Plaintiffs - Appellees,

v.

PHILLIPS 66 COMPANY, a foreign
corporation,

      Defendant - Appellant.

No. 15-5119

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:14-CV-00086-JHP-PJC)**

---

Frank D. Davis, (Gavin S. Martinson, with him on the briefs), of Ogletree, Deakins, Nash,
Smoak & Stewart, P.C., Dallas, Texas, for Defendant-Appellant.

Anthony Resnick, United Steelworkers of America, Pittsburgh, Pennsylvania (Steven R.
Hickman, of Frasier, Frasier & Hickman, LLP, Tulsa, Oklahoma, with him on the brief),
for Plaintiffs-Appellees.

---

Before **BRISCOE**, **MURPHY** and **PHILLIPS**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Phillips 66 Company ("the Company") appeals from the district court's grant of summary judgment and order compelling arbitration. The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local 13-857 (collectively, "the Union") filed two grievances on behalf of employees of the Company and sought arbitration pursuant to the grievance procedure in the parties' collective bargaining agreement ("CBA"). The Company refused to arbitrate. The Union sued and the district court issued an order compelling arbitration. The Company now appeals, arguing that the grievances are not arbitrable under the CBA. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

*A. Background and the CBA*

The Union is the collective bargaining representative of employees at the Company's oil refinery in Ponca City, Oklahoma. The Company was a subsidiary of ConocoPhillips, the previous owner of the refinery. The Company spun off from ConocoPhillips to form an independent entity, and ConocoPhillips transferred the Ponca City refinery and other various assets to the Company in the spin-off. When the Company took over the refinery, it assumed the CBA with the Union.

The provisions of the CBA relevant to this case are Articles 15 and 30, and a Letter of Understanding (the "Letter") between ConocoPhillips and the Union. Article 15 states in part:

The . . . benefit plans available to the employees in this bargaining unit on the date of [the CBA,] [including the Employee Medical and Dental Plans,] shall be continued for the period of [the CBA] subject to the rules and regulations of the plans and [the CBA].

. . .

Eligible employees covered by the [CBA] will participate in the Employee Medical and Employee Dental Plans generally available to the employees of the Company as of the date of [the CBA] as well as subsequent modifications to these Plans that might occur during the term of [the CBA] that also apply generally to the employees of the Company.

The Company agrees to pay 80% of the premiums for the Employee Medical and Dental Plan. The Company also agrees to pay 80% of any premium increases that occur during the term of [the CBA]. Employees covered by [the CBA] are responsible for the remaining 20% of the premium and 20% of any premium increases occurring during the term of [the CBA].

Aplt. App. at 39–40.

The Letter of Understanding states in part:

The parties agree that in the event [Conoco Phillips] enters into an agreement to sell the Ponca City Refinery covered by the [CBA] in its entirety to a third party or enters into a joint venture or merger agreement covering the Ponca City Refinery in its entirety, [Conoco Phillips] will include in any sale, merger or joint venture agreement the requirement that the successor company shall recognize the Union as the exclusive representative of the bargaining unit and shall adopt the [CBA] and all existing Memoranda of Agreement. . . .

Except that such successor company shall not be required to continue the existing employee benefits, but shall be entitled to establish a package of benefits for employees covered by the [CBA] that are reasonably comparable in the aggregate. If requested by the Union, the [successor] company shall negotiate with the Union in good faith regarding those benefits. Should an agreement not be reached, the successor company may proceed with implementation of the proposed Benefits Plans and the Union will not have the right to strike.

3

> However, if the parties are unable to reach an agreement on Benefits Plans, the successor company will have the option to waive the foregoing "reasonably comparable Benefits Plans in the aggregate" commitment and provide the Union with the option to strike the successor employer on Benefits Plans only by giving the successor company 45 days notice within 15 days after the Union has been informed by the successor company that it is waiving the commitment for "reasonably comparable Benefits Plans in the aggregate".

Id. at 96–97.  A later addendum to the CBA dictates that the Letter would remain in force for the term of the CBA.

Article 30 dictates a four-step procedure for settling grievances.  Step A begins when the grieving party requests a meeting with a supervisor to discuss the details of the grievance.  If the Company denies the grievance at Step A, the grieving party may progress to Step B by providing the grievance in writing to the second level of supervision.  If the Company denies the grievance again, the party may proceed to Step C, where the grievance will be discussed at the next meeting between the Union and the Company's management.  If the Company denies the grievance at the first three steps, then the grieving party may submit the dispute to arbitration.  The CBA's arbitration clause defines the scope of arbitration: "Only differences arising between the Union and the Company relating to interpretation or performance of [the CBA] which cannot be adjusted by mutual agreement and have gone through the grievance procedure are arbitrable, except as otherwise provided in [the CBA]."  Id. at 84.


*B. The Grievances*

4

In July 2012, the Company notified the Union that certain benefits plans would be modified or canceled, including benefits for current employees and retirees contained in the Employee Medical Plan, effective January 1, 2013.  The Union responded in September 2012, requesting to bargain over the changes pursuant to the CBA, thereby initiating the grievance procedure.  The Company denied the request to bargain, and the Union filed two written grievances: Grievance R12-5 (Changes to Employee Medical Plan) and Grievance R12-6 (Changes to Retiree Medical Plan).  In Grievance R12-5, the Union said in part:

> The Union sites [sic] articles 1, 3 and 15 in this grievance, as well as the successor ship [sic] letter, and any other articles that may be found to apply. Article 15 states that the Company agrees to pay 80% of the premiums for the plan, and also states that the Company agrees to pay 80% of any premium increases.  It appears that the plan increases for the employee exceed the medical inflation rate and therefore exceed the 20% employee portion.

Id. at 111.  With respect to the Company's "High Deductible Health Plan (HDHP)" and "Primary Preferred Provider Organization (PPO)" plan, id. at 103, in Grievance R12-5, the Union also said:

> Further, the HDHP plan [sic], or "consumer" plan, has and [sic] employee premium even though 100% of the HDHP/Consumer premium would be less than the 80% portion of the PPO plan.  We believe the PPO [plan] to be the benchmark plan for purposes of 80/20.  In previous years the HDHP plan [sic] premium for employees was $0, or effectively $0 with the wellness credit.

> The Union demands that the Company honor the CBA, adjust the premiums and comply with the 80/20 language and make whole all affected employees.  Further, the Union demands that the Company seice [sic] and desist violating the CBA.

Id. at 111.

In Grievance R12-6, with respect to "the Company's proposed changes to the retiree medical plan," id. at 112, the Union said in part:

> The Company has denied the Union's demand to bargain, citing Article 15. Article 15 does not mention the retiree medical plan.
>
> The Union cites Articles 1, 3 and 15 in this grievance as well as the successor ship [sic] letter and any other articles that may be found to apply. The Union demands that the Company honor the CBA and make whole all affected employees. Further, the Union demands that the Company seice [sic] and desist violating the CBA.

Id.

The Company responded to both grievances. As to the Retiree Medical Plan, the Company responded that "[t]he retiree medical plan is not a separate medical plan, but a part of the Employee Medical Plan." Id. at 118. The Company then stated that "[u]nder Article 15, the Union ha[d] explicitly agreed to the terms of the Company medical plans, as well as any subsequent modifications, which generally apply to all Phillips 66 employees" and that, because the proposed modifications applied to all Company employees (and retirees), the modifications were "permissible under Article 15." Id. at 115, 118. The Company also pointed out that ConocoPhillips had modified the plans on several occasions, to which the Union had not filed grievances.

Next, the Company contended that the Letter of Understanding was not relevant to the dispute because it only applied if ConocoPhillips sold the refinery or entered into a joint venture or merger with another company to manage the refinery, whereas

6

ConocoPhillips had spun off the refinery to the Company. Finally, as to only Grievance

R12-5, the Company said:

> In addition, contrary to the Union's claims, there is no requirement under the [CBA] that the PPO medical plan be used as a "benchmark" for calculating employee premiums paid for other medical plans. We also note that the [CBA] contains no reference to a "medical inflation rate", or that this be used as a factor to calculate employee premiums. Rather, Article 15 clearly states the method to be used when calculating employee premium costs for the medical and dental plan, as well as the cost allocation for premiums between the Company and employees (the "80/20 split") . . . .
>
> . . .
>
> In this instance, the Company will pay more than 90% of the total cost for the HDHP in 2013 as confirmed by data recently submitted to the Union in response to an information request. This is well in excess of its obligations under Article 15.

Id. at 115.

The Union advanced the grievances to Step C, and the Company replied with

statements virtually identical to its Step B responses. The Union requested to advance the

grievances to arbitration. The Company refused:

> The Company has been advised of your request to arbitrate the above-referenced grievances. However, these grievances are not arbitrable, and the Company will not agree to arbitrate these matters. Pursuant to Article 15 of the [CBA], the Union agreed to participate in certain Employer-sponsored benefit plans ". . . as of the date of this Agreement as well as subsequent modification to these Plans that might occur during the term of this Agreement . . . [.]" As such, the decision to modify such plans has been delegated to the Company under the CBA, and there is nothing to arbitrate. The Company clearly did not agree to arbitrate disputes arising from such modifications.
>
> Furthermore, over the past several years, the Company has often made changes to these Plans pursuant to the language of Article 15, never

7

bargained with the Union regarding such changes, and the Union has never sought to arbitrate over the Company's right to make such changes or the changes themselves. Thus, by its past practice, the Union has waived its right, to the extent it ever had such right, to arbitrate the Company's right to make such changes, or the changes themselves.

The Union's claim that its right to arbitrate these disputes arises under the Parties' Letter of Understanding regarding successorship is similarly misplaced. That Letter of Understanding only applies to a sale, merger, or joint venture. It is undisputed that ConocoPhillips' spin-off of Phillips 66 to new owners does not qualify under any of those three corporate transactions. Therefore, there was never any agreement to arbitrate such disputes.

Finally, with respect to R12-6 and the Retiree Medical Plan, there is no agreement to arbitrate any dispute over changes to such benefits because there is no duty to bargain over such benefits in the first place and, therefore, nothing to arbitrate.

Id. at 134.

The Union filed suit in the Northern District of Oklahoma, seeking an order to compel arbitration. After cross-motions for summary judgment, the court granted summary judgment for the Union, ordering the parties to submit both grievances to arbitration. The Company timely appealed.

II

We review de novo the grant of summary judgment, including where the district court has ordered arbitration, "applying the same legal standard as the district court." Commc'n Workers of Am. v. Avaya, Inc., 693 F.3d 1295, 1300 (10th Cir. 2012). "Whether a particular grievance is arbitrable under the terms of a collective bargaining agreement is a question of law we review de novo." Local 5-857 Paper, Allied-Indus.,

8

Chem. & Energy Workers Int'l Union v. Conoco, Inc., 320 F.3d 1123, 1125 (10th Cir. 2003). The Supreme Court's pathmarking "Steelworkers trilogy" established the framework used to determine whether a collective-bargaining dispute is arbitrable. See United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564 (1960). The Court also recently "reemphasize[d] the proper framework for deciding when disputes are arbitrable under [its] precedents." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297 (2010).

Whether the parties intended to arbitrate a particular dispute "typically" is a question for a court rather than an arbitrator. Id. at 296. The parties must have consented to arbitrate the dispute at issue: "Arbitration is strictly 'a matter of consent,' and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" Id. at 299 (first quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989); then quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)). On the other hand, the Supreme Court has recognized a "federal 'policy favoring arbitration'" of labor disputes. Id. at 301 (quoting AT&T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 649 (1986)); Avaya, 693 F.3d at 1300 (citing Warrior & Gulf, 363 U.S. at 582).

We strike a balance between these competing principles by applying a presumption that a dispute is arbitrable unless we may say "with positive assurance" that the parties intended otherwise:

9

The Supreme Court has held that when a collective-bargaining agreement contains an arbitration provision, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." This rule reconciles the principle that "a party cannot be required to submit to arbitration any dispute [that] he has not agreed so to submit" with the federal policy and presumption favoring arbitration in the labor context.

Int'l Bhd. of Elec. Workers, Local #111 v. Pub. Serv. Co. of Colo., 773 F.3d 1100, 1107–08 (10th Cir. 2014) (alteration in original) (citations omitted) (first quoting AT&T Techs., 475 U.S. at 650; then quoting id. at 648).

Courts "discharge this duty by: (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted." Granite Rock, 561 U.S. at 301. To rebut the presumption, the party opposing arbitration must provide "forceful evidence" that the parties intended to exclude the dispute from arbitration: "In the absence of any express provision excluding a particular grievance from arbitration," the Court held, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here . . . the arbitration clause [is] quite broad." Warrior & Gulf, 363 U.S. at 584–85.

Therefore, "[w]hen a collective-bargaining agreement contains an arbitration provision and a dispute arises between the parties to the agreement, a court should send the dispute to arbitration unless it can say with positive assurance that the arbitration

10

provision is not susceptible to an interpretation that covers the dispute." Local #111, 773 F.3d at 1107. We must examine the grievances here and determine whether they fall within the scope of the arbitration agreement contained in Article 30. Unless we can say with positive assurance that they do not, we must affirm the order compelling arbitration, unless the Company has rebutted the presumption with forceful evidence that the parties intended to exclude the grievances from arbitration.

### A. *The Scope of the Arbitration Agreement*

The arbitration agreement in Article 30 of the CBA states: "Only differences arising between the Union and the Company relating to interpretation or performance of [the CBA] which cannot be adjusted by mutual agreement and have gone through the grievance procedure are arbitrable, except as otherwise provided in [the CBA]." Aplt. App. at 84. The grievances here went through the grievance procedure and could not be adjusted by mutual agreement. Therefore, the grievances fall within the scope of the arbitration agreement if they are differences arising between the Union and the Company relating to interpretation or performance of the CBA, unless the CBA otherwise provides an exception.

In Grievance R12-5, the Union expressly alleged violations of the Company's performance obligations under the CBA. Specifically, the Union alleged that the Company had violated its obligation in Article 15 to pay 80% of benefit plan premiums and increases in those premiums, contending that "[i]t appears that the plan increases for the employee exceed the medical inflation rate and therefore exceed the 20% employee

11

portion." Id. at 111. The Union further alleged that the HDHP charged a premium "even though 100% of the HDHP/Consumer premium would be less than the 80% portion of the PPO plan." Id. It alleged that this would violate the CBA, because the Union "believe[ed] the PPO [plan] to be the benchmark plan for purposes of 80/20," whereas, "[i]n previous years, the HDHP . . . premium for employees was $0, or effectively $0 with the wellness credit." Id. This grievance relates to both the Union's interpretation of the 80% obligation and the Company's performance of that obligation. The Union also alleged violations of the CBA, albeit less specifically, in Grievance R12-6. In both grievances, the Union alleged that the Company had violated Articles 1, 3, and 15, and the Letter of Understanding.

In its responses to the grievances, the Company argued that it had not violated the CBA. For example, the Company disputed that it had violated the 80% obligation, contending that it would pay "well in excess of its obligations under Article 15." Id. at 115. Thus, the Company and the Union did not disagree that Article 15 applied to the dispute. Instead, they disagreed on whether the Company had violated Article 15. The Company in fact argued that Article 15 applies, but that the Union's interpretation of the CBA is incorrect.

Once the Union requested to proceed to arbitration, the Company responded that the parties did not agree to arbitrate the grievances. The Company argued that Article 15 indicated the Union's agreement that the Company could unilaterally modify the benefit plans. The Company argued that it "clearly did not agree to arbitrate disputes arising

12

from such modifications." Id. at 134. This argument itself shows that the parties differed over the interpretation of Article 15—and it ignores the main thrust of Grievance R12-5, which was that the Company had breached its 80% premium-coverage obligation under the CBA. Regarding Grievance R12-6, the Company argued that "there is no agreement to arbitrate any dispute over changes to [the Retiree Medical Plan] benefits because there is no duty to bargain over such benefits in the first place and, therefore, nothing to arbitrate." Id. These arguments related to the interpretation of Article 15 and the Company's performance obligations under that article.

The scope of the arbitration clause is broad; the disputes between the parties need only *relate to* interpretation or performance of the CBA. The parties' disputes here almost certainly relate to the interpretation or performance of the CBA, and the Company has not shown otherwise. Therefore we cannot say with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the grievances unless the Company shows an express provision of the CBA excludes the grievances from arbitration or has adduced forceful evidence showing the parties did not intend to arbitrate them. See Warrior & Gulf, 363 U.S. at 584–85.

The Company does not point to any express provision excluding the grievances from arbitration. On appeal, the Company argues that "benefits disputes under the Letter" are excluded from the arbitration procedure because the Letter "provides its own dispute-resolution procedures separate from the CBA's grievance/arbitration process." Aplt. Br. at 13. But that procedure requires that the successor company provide benefits

13

"that are reasonably comparable in the aggregate" and, upon request, "negotiate with the Union in good faith regarding those benefits." Aplt. App. at 96. The Letter does not provide a procedure in the event that the successor company does not negotiate in good faith. Therefore, we cannot interpret the above language to exclude from arbitration disputes related to the interpretation or performance of the Letter where, as here, the Company refuses to negotiate in good faith. We cannot say with positive assurance that the Letter excludes these grievances from arbitration.

The Company also argues that the Union relinquished its right to negotiate the terms of the benefit plans because, per Article 15, participation in the plans is subject to "subsequent modifications to these Plans that might occur." Aplt. Br. at 8. This is an argument over the interpretation of Article 15, not an express exclusion from arbitration. The interpretation of this language in the CBA is an example of exactly what the parties reserved for arbitration. Even if the meaning of this provision of the CBA were unambiguously favorable to the Company (which we do not decide), we could not deny arbitration on that basis, because we do not compel the arbitration of "merely those [grievances] that [we] may deem to be meritorious." Am. Mfg. Co., 363 U.S. at 567; see also Avaya, 693 F.3d at 1300 (holding that we do not rule on the potential merits unless they "are bound up with the question of arbitrability").

The Company does not cite any other express provision in the CBA that excludes

14

the grievances from the scope of arbitration.[1]  We cannot say with positive assurance that the arbitration agreement is not susceptible to an interpretation that covers the grievances. Therefore, the parties must arbitrate the grievances unless the Company has provided forceful evidence that the parties intended to exclude them from arbitration.

### B. *No Forceful Evidence to Exclude the Grievances from Arbitration*

On appeal, the Company attempts to show that the parties intended to exclude the grievances from arbitration in three ways.  First, it contends that "[t]he Plan is not a negotiated part of the CBA, and changes to the Plan are not subject to the CBA's arbitration clause."  Aplt. Br. at 7.  Second, it argues that "[t]he Plan's independent dispute-resolution procedure is evidence that the parties did not intend to arbitrate disputes over Plan amendments."  Id. at 9.  Third, it maintains that "[t]he Letter of Understanding demonstrates that the Grievances are not arbitrable."  Id. at 12.  None of these arguments is forceful evidence that the parties intended to exclude the grievances from arbitration.

---

[1] The CBA expressly excludes certain claims from arbitration.  See Aplt. App. at 171 (art. 11) ("Discharge for a confirmed positive test under the substance abuse policy shall not be subject to grievance or arbitration."); id. at 172 (art. 11) ("Grievances originating under Article 11 are subject to the grievance procedure but cannot be submitted to arbitration; and no arbiter has the authority to rule on Article 11 with the exception of determination of just cause in the first sentence of Article 11."); id. at 194 (art. 20-3) ("During the period an employee is classified as probationary, his termination shall not be subject to the grievance procedure and arbitration."); id. at 225 (art. 37) ("Discharge of any casual/temporary employee shall be at Management's discretion and shall not be a subject for grievance or arbitration.").  The Company does not cite any such provision that applies here.

15

The Company's first argument is that the grievances only "challenge amendments to the benefits Plan—a document outside of and independent from the CBA." Id. at 7. The Company then suggests that "the parties expressly agreed" in Article 15 that the Plan could be modified "according to the Plan rules." Id. at 8. Under those rules, it avers, the Plan may be unilaterally amended, notwithstanding the terms of Article 15. The Company states that the Union "expressly agreed" to allow the Plan to be amended unilaterally "in exchange for access to the Plan." Id. at 9. It also argues that anything "outside the four corners of the CBA" is not arbitrable. Id.

The Company misstates the Union's argument. The Union did not merely challenge the amendments to the benefits plans; it also challenged the right to unilaterally modify the plans in the first place. As just one example, the Union alleged that the Company violated its obligation to pay 80% of any increase in the employees' premiums under any new or modified plan—a dispute squarely on the terms of Article 15. The Company fails to address this allegation in its briefing. And though it did not concede the issue, at oral argument the Company offered no plausible rationale for concluding that a dispute over the CBA's 80/20 rule does not relate to the CBA.

Where the Company says the Union "expressly agreed" to anything, not only does the Company exaggerate the terms of the CBA, it is arguing about the *interpretation* of the terms. The arbitration agreement encompasses disputes "*relating to* interpretation or performance of [the CBA]," Aplt. App. at 84, so the CBA is forceful evidence that arbitration is not restricted to the four corners of the CBA. And even if the Union were

16

arguing solely about the terms of the plans (which it is not), the plans arguably relate to the Union's interpretation and the Company's performance of the CBA. The Company's first argument fails to provide forceful evidence that the parties intended to exclude the grievances from arbitration.

The Company's second argument is that "[t]he Plan's internal dispute-resolution procedure further rebuts the presumption of arbitrability." Aplt. Br. at 9. The Company contends that challenges to Plan amendments must go through the Plan's procedures rather than the CBA's grievance process. That is so, it argues, because the Plan dictates that "the Plan's Administrators have sole authority 'to interpret the Plan' and 'to determine all questions of participation, benefit eligibility and benefit amount[s]'"; and further provides that the Plan Administrators "'review and resolve any disputes or claims which may arise under the Plan,' and [that] their determinations are 'binding, final and conclusive on all parties.'" Id. (quoting Aplt. App. at 284–85).

Most importantly, the internal rules of the Plan could not provide forceful evidence of the parties' intent because the parties did not adopt those rules together. Rather, the Plan document was adopted unilaterally—the last line of the document reads, "Phillips 66 Company has executed this document," with no mention of the Union or its involvement. Aplt. App. at 287. The Company does not offer evidence to the contrary. And because Article 3 of the CBA states that "[the CBA] is the entire Agreement between the [Union] and the [Company]," id. at 34, a conflicting provision in the Plan documents could not provide evidence of the parties' agreement.

17

Moreover, the Union does not seek an interpretation of the Plan or a determination of participation and benefits; the grievances did not arise under the Plan. Rather, the parties dispute the Company's authority to unilaterally modify or cancel the benefits plans under the terms of the CBA. The Plan's internal procedures are wholly irrelevant to a dispute over whether the Company violated the CBA, which is all the Union has alleged. The salient example is the alleged violation of the 80% premium-payment obligation, which is enumerated in the CBA, not the Plan. Therefore, the Plan does not provide forceful evidence that the parties intended to exclude the grievances from arbitration.

The Company's third argument is that the Letter of Understanding shows that the grievances are not arbitrable. It argues that the Letter is inapplicable because it only applies when there has been a sale, merger, or joint venture, whereas the Company spun off from its former parent company, ConocoPhillips. This argument requires interpreting the terms of the Letter, which was incorporated into the CBA. And the interpretation of the CBA is exactly what the parties agreed to arbitrate.

The Company then contends that, even if the Letter bears on the grievances, the parties did not agree to arbitrate disputes over the Letter, because it contains a separate dispute-resolution procedure allowing the Company to implement changes to the plans unilaterally without affording the Union the right to strike. But the Company is incorrect—for benefit plans, the Letter provides the Union with the right to strike if the successor company waives the commitment to provide reasonably comparable benefits in the aggregate. The Letter also does not specify a procedure in case the successor

18

company refuses to negotiate, so we must presume that the CBA's grievance procedure applies in such instances, as occurred here. Therefore, the Letter does not provide forceful evidence that the parties intended to exclude the grievances from arbitration.

III

We cannot say with positive assurance that the arbitration provision in the CBA is not susceptible to an interpretation that covers the grievances. The Company does not rebut that interpretation with forceful evidence of the parties' intent to exclude the grievances from arbitration. Therefore, the parties must arbitrate both grievances.

The judgment of the district court is AFFIRMED.