FILED
United States Court of Appeals
Tenth Circuit

March 15, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SOCIETY OF PROFESSIONAL
ENGINEERING EMPLOYEES IN
AEROSPACE, INTERNATIONAL
FEDERATION OF PROFESSIONAL
AND TECHNICAL EMPLOYEES,
LOCAL 2001,

      Plaintiff - Appellant,

v.

SPIRIT AEROSYSTEMS, INC.,

      Defendant - Appellee.

No. 16-3022
(D.C. No. 6:14-CV-01281-JTM)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **McKAY**, and **O'BRIEN**, Circuit Judges.
_____

The Society of Professional Engineering Employees in Aerospace, Local 2001

("SPEEA") sued Spirit Aerosystems ("Spirit") to compel arbitration of a grievance.

The district court granted summary judgment to Spirit, deciding an individual

employee's grievance had challenged a company-wide policy and thus was not

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

subject to arbitration under the parties' collective bargaining agreement ("CBA").

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse.

## I.  BACKGROUND

### A. *The CBA*

Article 3 of the CBA addresses grievances and arbitration.  Section 3.3 outlines a four-step process.  *See* Aplt. App. Vol. 2 at 78.  At step one, an employee brings an oral complaint to an immediate supervisor.  If unresolved, at step two the employee submits the complaint in writing to the supervisor, who meets with the employee and a union representative to resolve the grievance.  If the employee is still unsatisfied, at step three the employee may appeal to human resources for a meeting with both a company and union representative present.  If still unsatisfied, at step four the employee may seek arbitration to resolve the grievance.

Section 3.6 provides that "each grievance appealed to arbitration shall be the subject of a separate and distinct arbitration hearing and decision." *Id*. at 79.  Section 8.2(c) excludes from the grievance process the granting of a deviation from the general precept that "it is normally inappropriate to hire Contract personnel as direct hires during periods of surplus activity."  Aplt. App. Vol. 3 at 93.  Section 15.1(d) permits both the company and union to file a grievance "alleging a violation of the no strike obligation" or "no-lockout obligation," respectively, beginning at step three. Aplt. App. Vol. 4 at 105.  Section 18.2 states that a grievance alleging discrimination is subject to the Section 3.3 process "only if it is filed on behalf of and pertains to a

single employee. Class grievances under Article 18 shall not be subject to the grievance and arbitration procedure." *Id*. at 106.

## B. *Prior Litigation*

This court previously interpreted the parties' CBA. In 2012, SPEEA filed a grievance at step three, charging that Spirit "unilaterally calibrated the employee evaluation process in November 2011." *SPEEA v. Spirit Aerosystems, Inc. (SPEEA I)*, No. 12-1180-JTM, 2012 WL 5995552 at *4 (D. Kan. Nov. 30, 2012) (alterations and internal quotation marks omitted). In *SPEAA I*, the district court held that broad, class-wide grievances were not subject to arbitration under the CBA because the agreement limits step-three grievances between the union and company to lockout disputes. *Id*. at *6. This court affirmed, concluding "that the grievance process [does] not cover union disputes over employee evaluations." *SPEEA v. Spirit Aerosystems, Inc. (SPEEA II)*, 541 F. App'x 817, 819 (10th Cir. 2013). We stated that "the grievance procedure applies to grievances brought by individuals rather than class-wide grievances brought by the union." *Id*. at 819 n.1. We did not address whether a grievance brought by an individual could raise class-wide concerns.[1]

---

[1] We do not think *SPEAA II*'s or the parties' references to a "class-wide" grievance or dispute are used in the sense of a class action under Federal Rule of Civil Procedure 23. Instead, we understand the term generally to refer to a claim that would affect the interests of most SPEEA employees.

- 3 -

## C. *Mr. Hartig's Grievance*

In spring 2013, at SPEEA's suggestion, Spirit changed its health insurance plan to become self-funded.[2] Bill Hartig, a Spirit engineer and SPEEA member, filed a grievance in July 2013 challenging the $33.75 deduction from his paycheck for health care premiums. At step one, his supervisor responded that moving to self-funded health insurance "does not mean the insurance is 'free.'" Aplt. App. Vol. 12 at 363. Mr. Hartig emailed his step-two appeal. On August 30, Spirit responded to the grievance, stating that "[i]nsurance coverage is voluntarily elected during the annual open enrollment period, and the deductions from your wages are accurate and proper." Aplt. App. Vol. 7 at 192. Proceeding to step three, SPEEA appealed to human resources on behalf of Mr. Hartig. When Spirit asked for clarification of the issue, SPEEA's general counsel responded:

> [W]hether, after going self funded for the medical costs of its employees, the company can force the employees to pay 14% of some number the company determines. As far as a remedy goes, I will argue first that the whole unit gets the remedy of being made whole for all money paid pursuant to the 14%. In the alternative, if the arbitrator believes that this grievance has to be limited to Bill Hartig, he will get the make whole remedy and I will also seek a statement about the application of the language about the 14% going forward.

Aplt. App. Vol. 12 at 370. Spirit replied that the CBA does not authorize the union to bring a grievance and "broad, class-wide issues such as this are not subject to the

---

[2] A "self-funded" health insurance plan differs from fully insured health insurance plans in that the employer assumes responsibility for payment of claims rather than the insurance company.

- 4 -

contract's grievance process." It thus refused to have the step-three meeting and refused to submit the grievance to arbitration. Aplt. App. Vol. 7 at 193.

## D. *District Court Proceedings*

SPEEA sued to compel arbitration. SPEEA's Rule 30(b)(6) deponent testified it was seeking relief only for Mr. Hartig, not for the whole bargaining unit. The deponent testified "[t]hat [the general counsel]'s theory at that point in time back in June that is no longer in play and the result of this hearing, if you will, these depositions, will determine the scope of what goes forward. This is what we are talking about. . . . Bill Hartig's grievance as an individual for individual remedy." *Id*. at 229–30. He also testified that the "grievance is about them taking out premiums or employee contributions in a manner which is not outlined in our collective bargaining agreement. It has nothing to do with us and self-funding. It has to do with the actions by Spirit violating the employees['] rights under the collective bargaining agreement." *Id*. at 225.

On the parties' cross motions for summary judgment, the district court ruled for Spirit. The court first stated that "it is the substance of the grievance," not who initiates the grievance, "that determines whether it is a class or individual grievance." Aplt. App. Vol. 16 at 545. Noting that the grievance was whether Spirit violated the CBA by shifting to a self-funded plan and deducting from the paycheck of "every employee who had elected to obtain healthcare benefits through the company," the court found that Mr. Hartig's grievance was "a broad, class-wide dispute." *Id*. The court concluded that the grievance procedure does not cover class disputes because

- 5 -

Section 3.3 applies to individual employees and Section 3.6 separates individual grievances into distinct arbitration decisions. Sections 8.2 and 18.2, which remove from the grievance process two types of disputes that "are generally class disputes," *id*. at 546, also assured the court. This appeal followed.

## II. **DISCUSSION**

### A. *Collateral Estoppel*

Spirit argues our decision in *SPEEA II* precludes this suit under the collateral estoppel doctrine. Collateral estoppel "bars the successive litigation of any issue of law or fact" if the proponent establishes:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Stan Lee Media, Inc. v. Walt Disney Co*., 774 F.3d 1292, 1297 (10th Cir. 2014) (emphasis removed). In *SPEEA II*, the same parties as here received a final adjudication on the merits, and SPEEA had a full and fair opportunity to litigate the issue. But the issue presented here is different. In *SPEEA II*, the issue was whether the *union* could use the CBA's grievance and arbitration procedure to pursue a class-wide dispute. Here, the issue is whether the CBA contemplates arbitration of class-wide disputes when an *individual* brings the grievance. We therefore proceed to the merits.

B. *Summary Judgment Decision*

We review summary judgment de novo, applying the same standard as the district court and viewing the evidence in the light most favorable to the non-moving party. *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If a reasonable jury could return a verdict for the nonmoving party, summary judgment is inappropriate." *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (internal quotation marks omitted).

"Substantive arbitrability is concerned with the question of whether the parties have contractually agreed to submit a particular dispute to arbitration." *Denhardt v. Trailways*, *Inc*., 767 F.2d 687, 690 (10th Cir. 1985). Procedural arbitrability concerns whether "conditions precedent to an obligation to arbitrate have been met." *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 85 (2002) (internal quotation marks omitted). Courts decide the former; arbitrators decide the latter. *Id*. As in *SPEEA II*, the issue here is substantive because we must determine "whether a [CBA] creates a duty for the parties to arbitrate [a] particular grievance." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

"[A] party cannot be forced to arbitrate any issue he has not agreed to submit to arbitration." *Commc'n Workers of Am v. Avaya, Inc*., 693 F.3d 1295, 1300 (10th Cir. 2012). "Arbitration is strictly a matter of consent and thus is a way to resolve those disputes — *but only those disputes* — that the parties have agreed to submit to

- 7 -

arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (citation and internal quotation marks omitted). We thus look to the parties' agreement, *id*. at 301, 303, first asking whether it constitutes a valid agreement to arbitrate, and then whether the asserted dispute falls within the scope of the arbitration clause, *id*. at 299-301. If the arbitration clause is clear, our inquiry is over, but if the arbitration clause is ambiguous about whether it covers the dispute, we apply a rebuttable presumption of arbitrability. *See id*. at 302-03. This presumption is overcome only if we can say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T*, 475 U.S. at 650; *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584–85 (1960) ("[O]nly the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."). "When deciding whether the parties agreed to arbitrate a certain matter courts generally should apply ordinary principles that govern the formation of contracts." *Granite Rock*, 561 U.S. at 296 (ellipses and quotations omitted).

Neither party argues the CBA lacks a valid agreement to arbitrate. Applying ordinary contract principles, we determine the parties intended to submit the grievance here to arbitration. We resolve any latent ambiguity in the CBA by presuming the parties intended to arbitrate, and finding the CBA does not clearly exclude such grievances from arbitration. Mr. Hartig filed the grievance and SPEEA has advanced it on his behalf. Though resolution of his dispute about deduction of

health care premiums likely would affect other employees, this fact does not disqualify the dispute from arbitration under the CBA's terms.

To begin with, no express provision removes all class-wide grievances over company policies from the Section 3.3 four-step grievance process. The grievance process contemplates complaints from individual employees like Mr. Hartig. It does not prevent a claimant from grieving an issue that may affect co-workers. Similarly, Section 3.6 requires separate and distinct arbitration hearings for each grievance, but it does not follow that resolution of a particular dispute must affect only one employee. The district court reasoned that a "class dispute over company policy is incapable of resolution" at steps one and two. Aplt. App. Vol. 16 at 546. But there is nothing in the CBA that prohibits Mr. Hartig's grievance — deductions from his personal paycheck — from being heard and decided by his supervisor. In other words, a grieving employee raising a complaint with implications for others does not render the grievance process incapable of addressing his claim.

The district court also reasoned that Sections 8.2 and 18.2, which, respectively, exclude subcontracting deviations and class discrimination disputes from the grievance process, provide assurance that "Spirit did not intend to arbitrate class disputes." *Id.* But, again, it does not follow that an individual employee's complaint about health insurance premium deductions cannot be arbitrated because subcontracting deviations and class discrimination disputes cannot be arbitrated. If anything, the express exclusion of those types of disputes from the grievance process indicates that other types of class disputes are permitted under Section 3.3.

The district court described Mr. Hartig's grievance to be a "broad, class-wide dispute," Aplt. App. Vol. 16 at 545, but the CBA does not distinguish between class and individual disputes except for specific enumerated instances, such as discrimination grievances. The court concluded the CBA indicated "that the grievance procedure was not meant to deal with class disputes," but the CBA does not say that. *See id.* at 546. The Supreme Court has admonished that, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence" can exclude a grievance from arbitration. *Warrior & Gulf*, 363 U.S. at 584–85. There is no express provision in the CBA or forceful evidence that the grievance in this case is excluded from arbitration.

The district court relied in part for its construction of the CBA on an overbroad reading of *SPEEA II*, in which "class-wide grievance" referred to a grievance brought by the union. *See* 541 F. App'x at 819–20 & n.1. We gave no indication that class-wide grievances brought by an employee are proscribed under the CBA. The fact that the union stepped into the process at step three to bring Mr. Hartig's claim on his behalf does not change that Mr. Hartig, not the union, initiated the grievance process. Unlike "a union-company dispute about company policy [which] would be incapable of resolution at Steps One and Two," *see id.* at 820, Mr. Hartig's grievance was capable of resolution at those stages, and the fact it might affect a large number of employees does not make it a union-company dispute. We had no occasion in

- 10 -

*SPEAA II* to consider whether an *individual* can pursue a grievance in arbitration that would affect the interests of other employees.

### III.  **CONCLUSION**

The CBA's arbitration clause must be enforced because no express language in the CBA and no "forceful evidence of purpose" show otherwise.  *See Warrior & Gulf*, 363 U.S. at 585.  We therefore reverse the district court's grant of summary judgment for Spirit.

ENTERED FOR THE COURT,


Scott M. Matheson, Jr.
Circuit Judge

Case No. 16-3022, *Society of Professional Engineering Employees in Aerospace, International Federation of Professional and Technical Employees, Local 2001 v. Spirit Aerosystems, Inc.*

**O'BRIEN**, J., concurring in the result.

The only relevant question here is whether Spirit and SPEEA (hereinafter the "Union") agreed to arbitrate individual grievances[1] that may affect other employees, perhaps even most employees. The answer starts and ends with the terms of the Collective Bargaining Agreement (CBA).

"Arbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 299 (2010) (citation and quotation marks omitted). Whether the parties intended to arbitrate grievances concerning a particular issue is determined by the parties' agreement and ordinary contract principles. *Id.* at 301, 303; *see also M&G Polymers USA, LLC v. Tackett*, --- U.S. ---, 135 S. Ct. 926, 933 (2015). Even in the face of arguments seeking to invalidate them for public policy reasons, very broad agreements to arbitrate have been upheld if they are unambiguous. *See*, *e.g.*, *Am. Express Co. v. Italian Colors Rest.*, --- U.S. ---, 133 S. Ct. 2304, 2309 (2013) (rejecting plaintiffs' argument that arbitration agreement which

---

[1] Hartig claims his grievance applies only to him and affects only his paycheck. Most probably that is untrue, but it is also irrelevant. The district judge correctly recognized the possible implications for Spirit if Hartig prevails in arbitration—if, under Spirit's self-funded insurance plan, it cannot deduct an "employee premium contribution" from Hartig's paycheck, over time it will likely be unable to do so with respect to other employees. But his decision leaves begging the critical question—what the parties intended about arbitration in their CBA.

explicitly excludes class actions from its scope violates antitrust law policies); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 265 (2009) (arbitration agreement that "clearly and unmistakably" requires union members to arbitrate ADEA claims is enforceable; rejecting arguments that arbitration is an inappropriate forum to vindicate statutory antidiscrimination rights); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442, 446 (2006) (arbitration clause requiring arbitration of "[a]ny claim, dispute or controversy . . . arising from or relating to" the parties' agreement required dispute over agreement's validity to be decided by arbitrator; rejecting Florida Supreme Court's conclusion that enforceability of arbitration agreement should turn on Florida public policy and contract law); *Brown v. Coleman Co.*, 220 F.3d 1180, 1184 (10th Cir. 2000) (clause requiring arbitration of "all disputes or controversies arising under or in connection with" the plaintiff's employment contract was broad clause requiring arbitration of plaintiff's defamation claim against employer based on employer's explanation for his termination). The point is worth repeating: when an agreement to arbitrate is unambiguous, policies regarding arbitration, i.e., the presumption of arbitrability, have no place in the analysis.[2] *Granite Rock Co.*, 561 U.S. at 300, 303;

---

[2] Our circuit has not been entirely faithful to *Granite Rock*. We have either failed to mention it, *see, e.g., Int'l Bhd. of Elec. Workers, Local # 111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1107-08 (10th Cir. 2014), or, we mention it, but then retreat to older precedent. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union & its Local 13-857 (United Steel) v. Phillips 66 Co.*, 839 F.3d 1198, 1204-05 (10th Cir. 2016). As a result, we have said "when a collective-bargaining agreement contains an arbitration provision, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an

(Continued . . .)

2

*M&G Polymers*, 135 S. Ct. at 935. So is another: the <u>scope</u> of an agreement to arbitrate is determined, at least in this case, by the terms of the CBA (and affiliated documents) using classic methods for construing contracts. *Id*.

I recognize that this CBA, like most, deal with the interaction of three entities: the employer, the Union, and the employees for whom the Union is bargaining.[3] It is a mistake to assume, for instance, that the contract rights of the Union and those it represents are either identical or always congruent.[4]

---

interpretation that covers the asserted dispute." *Int'l Bhd. of Elec. Workers, Local # 111*, 773 F.3d at 1107; *see also United Steel*, 839 F.3d at 1204 (we "apply[] a presumption that a dispute is arbitrable unless we may say with positive assurance that the parties intended otherwise"; "[t]o rebut the presumption, the party opposing arbitration must provide forceful evidence that the parties intended to exclude the dispute from arbitration.") (quotation marks omitted). But, by presuming an issue is arbitrable absent positive assurance of a contrary intent, we have it backward. *Granite Rock* requires us to look <u>first</u> to the parties' intent and if that intent is ambiguous, to use the presumption to assist in resolving the ambiguity. *Granite Rock Co.*, 561 U.S. at 301-02. *M&G Polymer* reaffirms this proposition. 135 S. Ct. at 933-35 (rejecting inference that parties to collective bargaining intend retiree benefits to vest for life; such inference "violates ordinary contract principles" and "distorts the attempt to ascertain the intention of *the parties*") (quotation marks omitted).

[3] Under Section 1.1 of the CBA, Spirit "recognizes the Union as the exclusive bargaining agent for the [described] collective bargaining unit" for purposes "of *collective bargaining with respect to rates of pay and other conditions of employment*." (CBA, Section 1.1, Appellant's App'x at 76. (emphasis added)). But Section 1.2 provides: "*For purposes of the remaining articles of this Agreement*, the term 'employees' shall include only those persons who are a part of the unit as described in Section 1.1." (CBA, Section 1.2, Appellant's App'x at 77 (emphasis added)).

[4] This explains why the Union may be precluded from bringing a grievance concerning what might be called a class-wide dispute but a single employee is not. *Compare SPEEA v. Spirit Aerosystems, Inc. (SPEEA II)*, 541 F. App'x 817, 819-20 & n.1 (10th Cir. 2013) (unpublished), *with* Majority Opinion in this appeal.

3

Determination of disputes is covered in Article 3 of the CBA. "The term 'grievance' shall mean a written complaint involving the interpretation or application of this Agreement." (CBA, Section 3.1, Appellant's App'x at 78.) Analogizing to our prior decision, Spirit assumes an individual-company dispute about a company policy having class-wide effect should be treated the same as a union-company dispute about class-based company policies, which is not subject to arbitration *(SPEEA II)*. It reasons that an individual-company dispute over a class-wide issue could not even get started under the four-step sequential grievance process, CBA, Section 3.3 because it would be incapable of resolution at Steps 1 and 2. Class-wide issues must be decided by higher authorities than those involved in the first two steps.[5] Ultimately that argument fails, as the Majority Opinion has explained.

Spirit also points to Section 18.2 of the CBA which provides that a discrimination claim may follow the arbitration process only if the claim "is filed on behalf of and pertains to a single employee." (CBA, Section 18.2, Appellant's App'x at 106.) It contends this section reaffirms the notion that disputes involving multiple employees are

---

[5] Spirit points out that Section 15.1(d) of the CBA permits the sequential grievance process to start at Step 3 for disputes over the CBA's no strike and lockout provisions. According to it, "[s]uch a carve-in would not be necessary if class-wide disputes over company policies already were arbitrable." (Appellee's Br. at 25-26.) But those are issues for Spirit and the Union, not individual employees. See also, Note 2, *supra*. Significantly, and despite the permissive and abbreviated arbitration provision for strikes and lockouts, that section also permits Spirit and the Union to resort to the courts for injunctive relief without invoking or exhausting the grievance process.

4

not subject to arbitration. Actually, the plain language of the article shows the opposite to be true. It provides:

> **Section 18.2 Non-Discrimination Grievances.** Notwithstanding any other provision of Article 3, a grievance alleging a violation of this Article 18 [government prohibited discrimination] shall be subject to the grievance and arbitration procedure of Article 3 only if it is filed on behalf of and pertains to a single employee. Class grievances under Article 18 shall not be subject to the grievance and arbitration procedure under this Agreement.

The arbitration provision is restricted to defined discrimination claims. None are involved here. Since Section 18.2 only deals with discrete circumstances, it cannot readily be exported in the manner Spirit encourages. But it offers an apt analogy.

Consider, for example, a particular employment practice that might discriminate against an employee based on race, color, religion, age, etc. and would, therefore, be subject to the grievance process (and, if necessary, arbitration) with respect to that employee. But what if the practice also impacted one other employee, who also filed a separate grievance? Would those two individual grievances then amount to a class-wide grievance, excluded from arbitration? That would seem to stretch logic beyond elastic limits. But what about five individuals, or fifteen? What would be more likely to require exclusion, 25 or 50 or 100? Do the numbers matter or is it more about process? How about a group of employees who claim to be similarly situated and seek to consolidate their possibly disparate claims into one grievance and, if necessary, one arbitration? Spirit might not want to be involved in the intricate process of sorting out employees who are not similarly situated for arbitration and it ought not be required to do so because Section 18.2 excludes class grievances of discrimination claims from arbitration. Spirit

5

could, if it so chose, force each such discrimination claim to individual an determination. But merely claiming an individual grievance is excluded from arbitration because others, perhaps many others, might be similarly situated doesn't fly.

What about class grievances outside of the prohibited discrimination context? Spirit claims resolution of Hartig's claim will necessarily affect all employees (no sorting for "similarly situated employees" is necessary) and therefore his claim is not subject to arbitration. But Section 18.2 does not apply outside of its defined parameters and, since I can find no similar provision applicable to the larger context, I am confident that his grievance is subject to arbitration (since Spirit's other argument has been rejected by this panel). (Majority Op. at 8-10.)

A final word. Article 16 of the CBA incorporates Spirit's Employee Health and Welfare Benefit Plan, the purpose of which is to provide health, dental, vision, and prescription drug benefits to Spirit's employees. The costs of the Benefit Plan are borne by contributions from Spirit and its employees. To be eligible to participate in the Plan, an employee must "[a]gree and elect in the manner established by the Plan Administrator to reduce his . . . compensation" to contribute to the costs of the Plan. (Benefit Plan, Section 3.01(A), Appellant's App'x at 329.) The Benefit Plan gives the Plan Administrator "full power to administer [the] Plan in all of its details." (Benefit Plan, Section 9.01, Appellant's App'x at 338.) Those powers include, but are not limited to, determining in its discretion an employee's eligibility to participate in the Plan; "mak[ing] discretionary interpretations regarding the terms of [the] Plan and mak[ing] factual findings with respect to any issue arising under the Plan, its interpretation to be

6

final and conclusive on all person claiming benefits under [the] Plan"; "review[ing] and render[ing] decisions respecting benefit elections under [the] Plan"; and "mak[ing] and enforce[ing] such rules and regulations as it deems necessary or proper for the efficient administration of [the] Plan." (*Id.*)

Spirit told the district judge Hartig's dispute concerned the manner in which employees must reduce their compensation to pay for health benefits. So construed, it claimed the dispute was not arbitrable under the CBA because it must be decided by the Plan Administrator under the Benefit Plan. The district judge disagreed with Spirit's characterization of the grievance, saying the dispute did not concern the manner in which employees must reduce their compensation but rather the amount to be deducted from the employees' paycheck. That left the Plan Administrator with full power to administer the Plan, but without the power to establish the employee contribution rate for healthcare benefits.

The district judge's characterization of Hartig's grievance is at least debatable. According to Hartig, nothing could be deducted from his paycheck as an "employee premium contribution" once Spirit became self-funded and there was no longer an outside party providing the benefits. His argument, therefore, is not merely over the amount deducted but rather over the nomenclature used to deduct the amount. Indeed, the Benefit Plan says it is "[d]esigned to be funded by Employee contributions and by Employer nonelective contributions" and this appears to be true whether or not Spirit or a third-party insurer provides the benefits. (Benefit Plan, Section 1.02, Appellant's App'x at 325.) This dispute seems well within the Plan Administrator's powers to decide and,

7

in the context of the CBA, one management can delegate to the Plan Administrator. (CBA, Section 2.1, Appellant's App'x at 77 ("all . . . inherent managerial rights . . . are retained and vested exclusively in [Spirit], including, but not limited to, the rights in accordance with its sole and exclusive judgment and discretion.").) And that must be factored into the arbitration equation.

The broad powers assigned to the Plan Administrator may not be amenable to second guessing. Accordingly, if the Plan is construed *in pari materia* with the CBA it might well be that this issue is not fairly within the scope of matters committed to arbitration. A contract "is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." *Resolution Trust Corp. v. Fed. Savings & Loan Ins. Corp.*, 25 F.3d 1493, 1499 (10th Cir. 1994).

Although Spirit made a similar argument in the district court it did not raise it on appeal. *See Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived.") (quotation marks omitted). I would consider the matter waived for purposes of this appeal, but that should not preclude the district judge from revisiting the issue on remand, should he see fit to do so.

I concur in the result reached by the Majority.